UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILSON RODRIGUEZ MACARENO,

    Plaintiff,

v.

JOEL THOMAS, *et al.*,

    Defendants.

Case No. 2:18-cv-00421-RAJ

ORDER

## I. INTRODUCTION

This matter comes before the Court on the parties' motions for summary judgment and partial summary judgment. Dkt. ## 25, 57, 60. The Court will also address Defendants' motion to seal and the ACLU of Washington's (ACLU-WA) motion for leave to file an *amicus* brief. Dkt. ## 36, 45.

For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** Defendant Officers' Motion for Partial Summary Judgment (Dkt. # 25); **GRANTS** Defendant City of Tukwila's Motion for Summary Judgment (Dkt. # 57); and **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Partial Summary Judgment (Dkt. # 60). The Court also **GRANTS** Defendants' motion to seal and the ACLU-WA's motion for leave to file an amicus brief. Dkt. ## 36, 45.

//

//

ORDER – 1

## II. BACKGROUND

Plaintiff Wilson Rodriguez Macareno claims he was unlawfully arrested on February 8, 2018 after calling the police about a trespasser on his property. Dkt. # 1, ¶ 1. Defendants Peter Tiemann and Art Stephenson, officers with the Tukwila Police Department (TPD), soon arrived on scene and confronted the suspected trespasser. Dkt. # 26, Ex. A at 0:00-2:00; Dkt. # 28, Ex. A at 0:00-2:40; Dkt. # 30, Ex A. at 0:00-0:50. Minutes later, two more TPD officers, Defendants Joel Thomas and Craig Gardner, arrived. Dkt. # 29, Ex. A at 0:00-0:50. While Stephenson talked to the suspect, Thomas requested identification (ID) from Plaintiff and a person identified later as Plaintiff's co-worker. *Id.* at 2:00-20. Plaintiff and the co-worker, who had initially seen the suspect on the property, complied by providing Washington state IDs. *Id.* at 2:24, 4:46; Dkt. # 60 at 3. Stephenson continued to investigate the trespass and eventually issued a warning order prohibiting the suspect from reentering the property. Dkt. # 26, Ex. A at 12:30-13:30.

While this was ongoing, Thomas relayed the identifying information on the Washington state IDs over police radio dispatch. Dkt. # 29, Ex. A at 4:48-6:15. The dispatcher found no hits in the criminal justice database for the co-worker, but reported that Plaintiff was an alien unlawfully present due to an order of removal or exclusion from the United States. *Id.* at 8:40-9:00. Overhearing what was said, Gardner told Tiemann to stay with Plaintiff. *Id.* at 9:29. Gardner and Thomas then returned to the patrol vehicle where Thomas used his mobile laptop to review information from "ACCESS," a law enforcement data system. Dkt. # 18, ¶ 2; Dkt. # 18-2. The ACCESS system identified Plaintiff as having an outstanding administrative warrant for removal and provided a Law Enforcement Support Center (LESC) phone number to confirm the warrant and the availability of a U.S. Immigration and Customs Enforcement (ICE) detainer. Dkt. # 29, Ex. A at 9:40-12:36; Dkt. # 18-2; Dkt. # 39, ¶ 7. After reviewing the information, Thomas proceeded to call LESC. Dkt. # 29, Ex. A at 13:13.

Tiemann stayed with Plaintiff as instructed. Dkt. # 30, Ex. A at 25. The two

ORDER – 2

engaged in conversation and Plaintiff began offering specifics on his situation—that he was "illegal," had three children, and "had [this] problem for a long time." *Id.* at 13:40-13:45. Plaintiff also made comments about the immigration system, stating "I break the law but … I don't know what I did." *Id.* at 18:30-35. Tiemann responded that he "d[id] not know a lot about immigration," and asked Plaintiff whether it made a difference that his children were born in the U.S. *Id.* at 19:05-08. Gardner and Stephenson rejoined soon thereafter, and Gardner asked Plaintiff if he had this warrant outstanding for a while. *Id.* at 26:57-27:27. After some initial confusion, Plaintiff answered affirmatively. *Id.* Gardner said Thomas was "calling [ICE] and seeing what they want to do," but told Plaintiff that "we don't have you for charges." *Id.* at 27:25-27:35. Gardner proceeded to handcuff and search Plaintiff, and told him that he would be free to go if ICE did not want to confirm the warrant or send a detainer. *Id.* at 27:50-28:00. The officers then led Plaintiff toward the patrol cars but confirmed that he was not yet under arrest. *Id.* at 31:40.

At this point, Stephenson and Tiemann left the scene to respond to another call. Dkt. # 26, Ex. B, at 8:00-8:24. Plaintiff remained with Gardner and Thomas. After receiving confirmation that the warrant was valid, and that ICE wanted Plaintiff detained, Thomas agreed to bring him over to the detention facility. Dkt. # 39 at 14. Thomas searched Plaintiff, placed him into the back of the patrol car, and then, together with Gardner, drove him to the detention facility. Dkt. # 29, Ex. A, at 50:00-60:00. Once there, Gardner asked the ICE agents if they had a copy of the detainer. *Id*. at 59:52-59:55. One responded that he had "nothing right now." *Id*. at 59:57. The TPD officers elected to remain at the facility until ICE could obtain a copy of a detainer. *Id.* at 1:07:54-58.

While they waited, Gardner and Thomas gave ICE the identifying information for Plaintiff's co-worker; they also commented that their ability to receive photographs of suspected removable aliens from ICE was "a great service to have." *Id.* at 1:11:47-1:13:00; Dkt. # 61-5 at 10. Gardner then made comments about the fact that Washington issues state IDs to everyone, which led to a discussion on states that issue IDs to "illegals" and

ORDER – 3

their compliance with the REAL ID Act. *Id.* at 1:13:30-1:14:00. Gardner expressed his hope that the courts will settle these issues "during these four years," before instructing Thomas to turn off his bodycam. *Id.* at 1:14:30-1:15:00. ICE eventually provided Defendants with a copy of the detainer, concluding the encounter. Dkt. # 39 at 14.

Plaintiff brings this action and alleges Defendants Thomas, Gardner, Tiemann, and Stephenson (collectively, "Defendant Officers") and Defendant City of Tukwila (altogether, "Defendants") wrongfully seized him in violation of 42 U.S.C. § 1983. Defendant Officers move for partial summary judgment on the issues of qualified immunity and punitive damages, and Defendant City of Tukwila moves for summary judgment on Plaintiff's *Monell* claim. Dkt. ## 25, 57. Plaintiff opposes and moves for summary judgment on his section 1983 claim against all Defendants.[1] Dkt. # 60.

### III. DISCUSSION

Before turning to the parties' summary judgment motions, the Court will address Defendants' motion to seal and the ACLU-WA's motion for leave to file an *amicus* brief.

#### A. Defendants' motion to seal

Defendants move to seal the order of removal issued for Plaintiff by the United States Immigration Court, attached as Exhibit B to the Declaration of Derek Chen. Dkt. # 36.

Local Rule 5(g) permits sealing where a statute, rule, or prior court order expressly authorizes the party to file the document under seal. Defendants note that Local Rule 5.2(c) requires this Court to seal the administrative record of a proceeding relating to an order of removal. Dkt. # 36. While Defendants move to seal the actual order of removal, and not the underlying record, the Court finds good cause to keep sensitive information about

---

[1] While Plaintiff brought this action against Defendant Officers in both their individual and official capacities, the parties agree that dismissal of the section 1983 claim against Defendant Officers in their official capacity is appropriate. *See Hafer v. Melo*, 502 U.S. 21, 21 (1991) ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."). The Court **GRANTS** Defendant Officers' motion on this issue.

ORDER – 4

Plaintiff's immigration status from public view. Therefore, the Court **GRANTS** Defendants' motion to seal.

### B. The ACLU-WA's motion for leave to file *amicus* brief

ACLU-WA moves to file an *amicus* brief opposing Defendant Officers' motion for summary judgment on qualified immunity. Dkt. # 45. Defendants oppose the motion. Dkt. # 52.

District courts may consider *amicus* briefs from non-parties "concerning legal issues that have potential ramifications beyond the parties directly involved or if the *amicus* has 'unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.'" *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d. 1061, 1067 (N.D. Cal. 2005) (quoting *Cobell v. Norton*, 246 F. Supp. 2d. 59, 62 (D.D.C. 2003) and *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1064 (7th Cir. 1997)). As a nonprofit legal organization with a focus on civil liberties, the ACLU-WA claims it has a strong interest in ensuring Washington law enforcement agencies comply with federal and Washington law. Dkt. # 45 at 2. Defendants contend that the *amicus* brief fails to add a new perspective to this case and simply reiterates Plaintiff's analysis. Dkt. # 52 at 1.

The Court finds the information contained in the *amicus* brief to be helpful, particularly on the changing nature of ICE warrants and the authority of local officers to enforce them. *See, e.g.*, Dkt. # 45 at 12-14. This information further demonstrates that the issues in this case have potential ramifications beyond the parties directly involved, most notably in the policing of civil immigration violations by local law enforcement. *NGV Gaming, Ltd.*, 355 F. Supp. 2d. at 1067. Lastly, the brief responds directly to Defendants' contention that the legal authority is unclear on the ability of local officers to act on ICE detainers. Dkt. # 45 at 11. To this extent, the Court finds the *amicus* brief useful and therefore **GRANTS** the ACLU-WA's motion.

//

ORDER – 5

**C.     Motions for summary judgment**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

However, the court need not, and will not, "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also, White v. McDonnel-Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (the court need not "speculate on which portion of the record the nonmoving party relies, nor is it obliged to wade through and search the entire record for some specific facts that might support the nonmoving party's claim"). The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and "self-serving testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. V. Pac Elec. Contractors Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987).

ORDER – 6

### i. Fourth Amendment analysis

As stated above, Plaintiff claims he was unlawfully arrested after calling 911 regarding a trespasser on his property. The Fourth Amendment protects individuals against unreasonable searches and seizures and is made applicable to the states by the Fourteenth Amendment. U.S. Const. amends. IV, XIV. To determine the parties' motions, the Court must first decide whether and when a seizure occurred, and if so, whether the law enforcement officers had adequate justification. *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968). Finally, in section 1983 cases, even if a seizure runs afoul of the Fourth Amendment, a plaintiff may not be able to obtain relief if the law enforcement officer is entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

A police encounter rises to the level of a Fourth Amendment seizure when the officer, by means of physical force or show of authority, has in some way restrained the liberty of the individual. *Terry*, 392 U.S. at 19 n. 6; *see Brendlin v. California*, 551 U.S. 249, 255 (2007) (stating that a seizure occurs "[w]hen the actions of the police ... show an unambiguous intent to restrain"). The Supreme Court also made clear that the Fourth Amendment encompasses investigatory stops made by law enforcement. *Terry*, 392 U.S. at 22; *United States v. Washington*, 387 F.3d 1060, 1067 (9th Cir. 2004). If an officer detains an individual for purposes of investigation, the stop must be both brief and supported by "reasonable suspicion" that the individual is engaged in criminal activity. *Terry*, 392 U.S. at 23–27. A lawful stop will be converted into an arrest, however, if the detention is effectuated in an unreasonable manner or for an unreasonable length of time. *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). For an arrest, reasonable suspicion will not suffice; the officers must have probable cause as justification for their actions. *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002).

In this case, the Court finds a seizure occurred when Gardner told Tiemann to watch Plaintiff, at which point Plaintiff was not free to leave. *Terry*, 392 U.S. at 19 n. 6; *Brendlin*, 551 U.S. at 255. Plaintiff was detained by TPD total for approximately fifty minutes. Dkt.

ORDER – 7

# 29, Ex. A, at 10:00-59:00. The record also makes clear that an arrest occurred when Gardner placed Plaintiff in handcuffs. *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990) (finding the use of handcuffs to be an important factor in determining that an arrest had taken place); *United States v. Chamberlin*, 644 F.2d 1262, 1267 (9th Cir. 1980) (holding suspect in police car and questioning him for twenty minutes constituted an arrest); *Washington*, 98 F.3d at 1187 (minor restraints on an individual's liberty may be considered a *de facto* arrest if the inherent danger of the situation does not justify the intrusive police action).

The Court must then determine whether the officers had reasonable suspicion for the investigatory detention or probable cause for the arrest. "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion.'" *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) (quoting *United States v. Montero–Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)) (emphasis in original). "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). This standard is met when there is a "fair probability" that a crime has been committed. *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986).

The Ninth Circuit has long made clear that mere unauthorized presence in the United States is not a crime. *See Melendres v. Arpaio,* 695 F.3d 990, 1000 (9th Cir. 2012); *Martinez–Medina v. Holder*, 673 F.3d 1029, 1036 (9th Cir. 2011); *Gonzales v. City of Peoria*, 722 F.2d 468, 476–77 (9th Cir. 1983) (explaining that illegal presence is "only a civil violation"). Furthermore, Congress generally left enforcement of immigration law to federal officials. *Arizona v. United States*, 567 U.S. 387, 411 (2012). However, there are still "specific, limited circumstances" when state and local officers may be involved. *Id.*

ORDER – 8

Local law enforcement officers may assist in federal immigration enforcement efforts under 8 U.S.C. § 1357(g)(1), which authorizes the Attorney General to enter into agreements with local law enforcement agencies that allow specific local officers to perform the functions of federal immigration officers. *Id*. at 408-09 (discussing section 287(g) agreements, certification, and training). Local law enforcement agencies may also "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," even in the absence of a written agreement. 8 U.S.C. § 1357(g)(10)(B). The Supreme Court nonetheless clarified that "no coherent understanding of cooperation" would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or instruction from the federal government. *Arizona*, 567 U.S. at 410. In this case, there is nothing in the record indicating a section 287(g) agreement between the City of Tukwila and the Attorney General. It is also undisputed that Plaintiff was stopped prior to any contact with federal authorities and arrested prior to any confirmation on the ICE warrant. Thus, if Defendants are to enforce immigration-related laws, they may only enforce immigration-related laws that are criminal in nature, which they are permitted to do even without section 287(g) authority. *Melendres*, 695 F.3d at 1000.

Defendant Officers make several arguments to justify their seizure of Plaintiff. First, Defendant Officers argue that they seized Plaintiff at the direction of the federal government and that the probable cause attested to in the ICE detainer provided the necessary justification for the detention and arrest. Dkt. # 25 at 13. This position fails to appreciate the fact that Plaintiff was detained before any contact with ICE and arrested before any confirmation of the ICE warrant. Dkt. # 30, Ex. A at 27:25-27:35. As a consequence, the Court finds these decisions were unilaterally made by Defendant Officers. *Arizona*, 567 U.S. at 410. Second, Defendant Officers claim they had independent justification to seize Plaintiff because he confirmed that he was "illegal" and ICE wanted to take him into custody. Dkt. # 25 at 13. Defendant Officers also contend

ORDER – 9

that the information accessed from Thomas's mobile laptop, which showed Plaintiff had an "immigration violation" for failing to appear for removal and an "outstanding warrant of deportation," gave them further evidence of his criminal activity. *Id.* at 17; Dkt. # 39 at 10. However, this justification is belied by Gardner's statement that TPD did not have Plaintiff for charges as he was handcuffed. Dkt. # 30, Ex. A at 27:25-27:35. Nor would that evidence, without more, form a basis for particularized suspicion of a crime. *Melendres*, 695 F.3d at 1000. And while Defendant Officers make much of the fact that Plaintiff's order of removal was signed by an immigration judge, and that they later obtained an ICE detainer, these were unavailable at the time of the seizure and thus do not factor in the reasonable suspicion or probable cause analysis. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusions to be drawn from the facts known to the arresting officer at the time of the arrest."); *United States v. Montoya de Hernandez*, 473 U.S. 531, 559 (1985) (explaining that "post hoc rationalizations" have no place in Fourth Amendment jurisprudence).

Based on the foregoing, the Court finds Defendant Officers violated Plaintiff's Fourth Amendment rights by seizing him only upon knowledge of suspected unlawful presence.

### ii. Qualified Immunity

Even if a constitutional violation occurred, Defendant Officers claim that they are entitled to qualified immunity. Dkt. # 25 at 1. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding whether qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case). As explained

ORDER – 10

above, Defendant Officers violated Plaintiff's Fourth Amendment rights when they seized him only upon knowledge of his suspected unlawful presence. Therefore, the key question is whether Plaintiff's constitutional right was "clearly established" when the seizure occurred.

The plaintiff bears the burden of proof to show that the right violated clearly established. *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014). "To meet this standard the very action in question need not have previously been held unlawful." *Id*. (quotation and internal marks omitted). This is particularly true in the Fourth Amendment context, where the constitutional standard of "reasonableness" demands a fact-specific inquiry. *Mattos*, 661 F.3d at 442. The question is "whether a reasonable officer would have had fair notice that [the action] was unlawful [.]" *Tarabochia*, 766 F.3d at 1125 (quotation omitted).

Plaintiff maintains that his Fourth Amendment right was clearly established because it is well-settled that an administrative warrant for removal does not provide reasonable suspicion or probable cause of criminal activity. Although *Arizona v. United States* did not resolve whether knowledge or suspicion of a civil immigration violation is an adequate basis to conduct a brief investigatory stop, the Supreme Court noted that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." *Id*. at 2509. The Ninth Circuit addressed this question in *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012). *Melendres* explained the circuit's position that, "criminality is key to any *Terry* investigatory stop or prolonged detention," and that "unlike illegal entry, mere unauthorized presence in the United States is not a crime." *See id*. at 1000 (citing *Martinez–Medina v. Holder*, 673 F.3d 1029, 1036 (9th Cir. 2011)). Thus, under established precedent, evidence of unlawful presence alone is insufficient to justify a seizure by local officers not empowered to enforce civil immigration violations. *Melendres*, 695 F.3d. at 1000; *see Harper v. City of L.A.*, 533 F.3d 1010, 1022 (9th Cir. 2008) (stating that "even strong reason to suspect" criminal activity is not enough to establish probable cause).

ORDER – 11

Defendants' own policies reiterate at much. *See* Dkt. 61-15 at 2 (stating "the fact that an individual is suspected of being an undocumented alien shall not be the sole basis for contact, detention, or arrest"). Accordingly, the Court agrees that Plaintiff's Fourth Amendment right was clearly established by an abundance of Ninth Circuit authority predating his detention by *at least* five years.

Defendant Officers insist that Plaintiff's constitutional right was not clearly established. They contend the law is unclear on whether it is a Fourth Amendment violation for local officers to detain an individual pursuant to an order of removal, or for failure to appear. Dkt. # 25 at 13; Dkt. # 61-17 at 13 (testimony describing the legal landscape around local enforcement of ICE warrants as "unclear" and "very confusing for officers"). Defendant Officers cite *United States v. Gomez-Robles*, No. CR-17-0730-TUC-CKJ (JR), 2017 WL 6558595 (D. Ariz. Nov. 28, 2017) for this proposition. In *Gomez-Robles*, local law enforcement independently arrested the defendant for aggravated DUI, criminal damage, endangerment, and possession of drug paraphernalia. *Id.* at *1. The next day, ICE officers identified through a specialized website that the defendant was in custody, had been previously removed from the United States, and "had a final order of removal from an immigration judge." *Id.* at *2. ICE sent the county jail an I-247 detainer, which stated the agency had probable cause of the defendant's removability based on a final order of removal. *Id.* The jail proceeded to detain the defendant based on the I-247 detainer. *Id.* The district court found no Fourth Amendment violation because the local officers held the defendant as expressly authorized by 8 C.F.R. § 287.7. *Id.* There is obviously a stark difference between the facts in *Gomez-Robles* and the facts here. Defendant Officers had no independent justification for detaining and arresting Plaintiff other than the ICE warrant. They also did not possess an I-247 detainer at the time of the detention and thus could not have relied on it in determining probable cause. Furthermore, Defendant Officers had not even confirmed the ICE warrant before seizing Plaintiff. Ultimately, *Gomez-Robles* is not binding authority and has no application here.

ORDER – 12

In a separate argument, Defendant Officers contend that the law was not clearly established as applied to the particular facts of this case, where notice of Plaintiff's order of removal came over radio dispatch and they detained him to investigate further. Dkt. # 25 at 16. This contention is equally without merit. It is Defendant Officers' responsibility for determining the justification for the stop or detention before it occurs—not after. *Melendres*, 695 F.3d at 1000 (local officers' enforcement of immigration law, absent section 287(g) authority, must be premised on criminality); *Santos v. Federick Cnty. Bd. of Com'rs*, 725 F.3d 451 (4th Cir. 2013) (law enforcement officers, not detainees, are responsible for identifying evidence justifying a seizure in immigration context). The facts known to the officers at the time of detention and arrest—that Plaintiff was unlawfully present due to an order of removal and had an outstanding administrative warrant for deportation—do not amount to probable cause of criminality. *Arizona*, 725 F.3d 451 ("If the police stop someone based on nothing more than possible removability, the usual predicate for arrest is absent."); *Melendres*, 695 F.3d at 1000 (evidence of unauthorized presence alone does not give rise to an inference of criminal activity); *Santos*, 725 F.3d 451 (4th Cir. 2013) (seizure of alien prior to confirmation of active ICE warrant was unlawful). The Court sees nothing unique about the facts of this case to warrant a different conclusion. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (existing precedent must place the constitutional question beyond debate).

Because Plaintiff's Fourth Amendment right was clearly established, the Court **DENIES** Defendant Officers' motion for qualified immunity.

### iii. Punitive Damages

Defendant Officers ask the Court to dismiss Plaintiff's claim for punitive damages. Dkt. # 25 at 19. In section 1983 cases, punitive damages are recoverable "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see Dang v. Cross*, 422 F.3d 800, 809 (9th Cir. 2005) ("Conduct

ORDER – 13

is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety, rights, or the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law."); *Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir. 1993). Section 1983 punitive damages can also be awarded to address "malicious, wanton, or oppressive acts or omissions." *Dang v. Cross*, 422 F.3d 800, 809 (9th Cir. 2005). To merit punitive damages, the defendant's conduct must be "the sort that calls for deterrence and punishment over and above that provided by compensatory awards." *Id*. at 54.

The evidence presented by Plaintiff fails to show Defendants Stephenson and Tiemann acted in such a way to leave them potentially liable for punitive damages. Although Stephenson was present at the scene, he had limited verbal or physical interaction with Plaintiff. Most critically, Stephenson continued the detention with Tiemann by standing near Plaintiff and aided Gardner in the handcuffing process. Dkt. # 26, Ex. B at 2:00-5:35. Tiemann's interactions with Plaintiff, in which they mostly engaged in conversation, are also insufficient to create a factual dispute on the issue of punitive damages. *See* Dkt. # 30, Ex. A at 12:00-30:00.

However, the Court finds a factual dispute prevents summary judgment as to Defendants Thomas and Gardner. Thomas, for example, attempted to determine the immigration status of an alleged crime victim, which is contrary to TPD's written policy. Dkt. # 61-15 at 3 ("Members should not attempt to determine the immigration status of crime victims and witnesses or take enforcement action against them absent exigent circumstances or reasonable cause to believe that a crime victim or witness is involved in violating criminal laws). The TPD policy also states, in pertinent part, that "[t]he immigration status of individuals alone is generally not a matter for police action" and that "[a]ll individuals, regardless of their immigration status, must feel secure that contacting law enforcement will not make them vulnerable to deportation." *Id*. Nonetheless, the record shows that Thomas voluntarily drove Plaintiff to the detention facility and offered

ORDER – 14

information to ICE about Plaintiff's co-worker, despite lacking any warrants or evidence of an immigration violation. Dkt. # 29, Ex. A, at 50:00-60:00, 1:10:00-1:13:00.

As for Gardner, it was his decision to place Plaintiff in handcuffs, even after stating that TPD did not have him for charges. Gardner also joined ICE in lamenting that Washington state issued licenses to "illegals" and expressed his hope that "the courts would settle these issues during these four years," before instructing Thomas to turn off his body camera. *Id.* at 1:14:30-1:15:00. A jury is best-suited to determine whether Thomas and Gardner acted with racial animus, or in reckless or callous indifference to Plaintiff's established constitutional rights, particularly given the fact that Plaintiff called the police as the victim of a potential crime. Accordingly, the Court **GRANTS in part** and **DENIES in part** Defendant Officers' motion on the issue of punitive damages.

### iv. *Monell* claim

The Court turns next to Plaintiff's *Monell* claim against Defendant City of Tukwila (the "City"). Both parties move for summary judgment.

A municipality can be liable under section 1983 if an official policy, custom, or practice directly caused the violation of an individual's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). To succeed on a *Monell* claim, a plaintiff must establish that (1) the law enforcement officers acted under color of law; (2) the officers' actions deprived the plaintiff if his/her rights as afforded by the Constitution; and (3) the officers acted pursuant to an official policy or longstanding practice or custom. *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992). Because it is undisputed that Defendant Officers acted under color of law and violated Plaintiff's Fourth Amendment rights, the only issue is whether the Defendant Officers acted pursuant to an official policy, practice, or custom.

Plaintiff argues that the City had a policy or practice of unlawfully detaining individuals based on any type of warrant. Dkt. # 60 at 18-19; Dkt. # 66 at 8. He points to the City's written manual, which he claims improperly authorizes TPD officers to enforce

ORDER – 15

civil immigration law when assisting ICE at its specific request. Dkt. # 61-15 at 2. But this section of the manual merely declares when local officers may assist ICE in enforcement of federal immigration laws and does not "affirmatively command" the officers to provide any assistance. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989). Absent a formal governmental policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Plaintiff similarly claims the City had a policy or custom of requiring officers to detain an individual while confirming any NCIC warrant hit. Dkt. # 60 at 18-19. While Plaintiff puts forth evidence that TPD generally confirms all warrants, this on its own does not suggest a policy of unlawful detention. With the limited record before the Court, and without evidence of other incidents, the Court cannot find TPD had such a long-standing policy. *See Davis v. Ellensburg*, 869 F.2d 1230 (9th Cir. 1989) (manner of one arrest insufficient to establish policy); *Meehan v. Los Angeles Cnty.*, 856 F.2d 102 (9th Cir. 1988) (two incidents not sufficient to establish custom).

Plaintiff argues separately that the City is liable based on TPD's alleged failure to adequately train its officers. To establish *Monell* liability on a theory of failure to train, a plaintiff must not only show that the training was inadequate, but that the city was deliberately indifferent to individuals' constitutional rights. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The fact that further training might have prevented any violation is insufficient—instead, the choice not to train must be deliberate. *See id.* at 392. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (alteration omitted) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001)). It may be evidenced where "the need for more or different training is so obvious, and the inadequacy [is] so likely to result in the violation of constitutional rights." *City of Canton*, 489 U.S. at 390.

Plaintiff claims the City offered no training to its officers on the nature of civil

ORDER – 16

immigration violations and their lack of authority to enforce federal immigration laws. Dkt. # 60 at 19. Although he admits that TPD's written policy manual contains two chapters addressing immigration issues, including on how to approach immigration violations, Plaintiff contends the City did not establish policies specifically instructing officers that a valid warrant must be signed by a neutral magistrate, or that ICE warrants do not constitute valid arrest warrants enforceable by TPD. *Id.* at 20. Plaintiff's *Monell* claim fails here because it must be supported by proof that the policymakers deliberately chose a training program which would prove inadequate. *See, e.g.*, *Johnson v. Hawe*, 388 F.3d 676 (9th Cir. 2004) (expert declaration created at least a genuine issue as to whether police 'self-training' amounted to deliberate indifference); *Aguilar v. City of L.A.*, 2018 WL 6016278, at *8-9 (C.D. Cal. Sept. 10, 2018) (finding triable issue on municipal liability for inadequate training where evidence showed police department had no training on handling suspects who ingest narcotics, which was a "fairly common occurrence"); *cf. Long v. Cnty. of L.A.*, 442 F.3d 1178, 1187 (9th Cir. 2006) (plaintiff stated a claim for municipal liability where complaint alleged a deliberate pattern and policy of refusing to train lawyers for capital cases). Furthermore, the evidence on the record falls short of raising a factual dispute on this issue.[2] In addition to the immigration chapters in its written policy manual, TPD contracts with a national corporation, Lexipol, to develop and update its policies and train officers. *See* Dkt. # 59-4 at 6. Additionally, Defendant's 30(b)(6) witness provided unrebutted testimony that TPD had not seen any trends associated with its handling of immigration issues, or administrative warrants, and that TPD had not encountered this type of administrative warrant prior to, or since, the encounter with Plaintiff. *Id.* at 9. While Plaintiff's encounter supports an inference that the City's training on civil immigration violations is severely negligent, and in need of serious reform, there

---

[2] The City asks the Court to strike two declarations filed by Plaintiff in support of its theory on inadequate training. Dkt. # 65 at 15. The Court will not strike the declarations, but acknowledges the evidentiary concerns raised in the City's motion.

ORDER – 17

must still be more than that for *Monell* liability. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (requiring evidence of program-wide inadequacy in training to create issue of fact on its deliberately indifferent character). Because no reasonable jury could conclude that Plaintiff meets the high standard for deliberate indifference, the Court **GRANTS** summary judgment in favor of the City on this claim.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS in part** and **DENIES in part** Defendant Officers' Motion for Partial Summary Judgment (Dkt. # 25); **GRANTS** Defendant City of Tukwila's Motion for Summary Judgment (Dkt. # 57); and **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Partial Summary Judgment (Dkt. # 60). The Court also **GRANTS** Defendants' motion to seal and the ACLU-WA's motion for leave to file an *amicus* brief. Dkt. ## 36, 45.

DATED this 8th day of May, 2019.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Judge

ORDER – 18